UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA,      :

      :

          -v-      :         18-CR-97 (PKC)

      :

      :

MICHAEL FODER,      :

      :

          *Defendant.*      :
-----------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF MICHAEL FODER

JAMES M. MOSCHELLA
Karasyk & Moschella, LLP
*Attorneys for Defendant Michael Foder*
233 Broadway, Suite 2340
New York, New York 10279
T: (212) 233-3800
F: (212) 233-3801
E: Jmoschella@kmattorneys.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ………………………………………………………1

I. OFFENSE CONDUCT ……………………………………………………….....3

II. GUIDELINES ANALYSIS ...........................................................................................9

      THE COURT SHOULD REJECT PROBATIONS' CALCULATION OF A 2-POINT
      ENHANCEMENT FOR "ABUSE OF A POSITION OF PUBLIC TRUST ....................9

III. PERSONAL HISTORY ...............................................................................................12

    A.    Foder Admirably Served the People of New York City as a 10-Year Law
    Enforcement Officer........................................................................................................12

    B.    Foder is a Devoted Father, Husband, and Friend ....................................................14

    C.    Foder is a Mentor to the Community ......................................................................18

IV. A NONCUSTODIAL SENTENCE IS APPROPRIATE HERE ...........................................20

    A.    A Noncustodial Sentence Will Adequately Reflect the Seriousness of the Offense,
    Promote Respect for the Law and Provide Just Punishment .................................20

    B.    The Public Scrutiny Surrounding Foder's Case and His Status as a Former Cop
    Weigh Heavily Against Imprisonment .................................................................22

    C.    A Custodial Sentence is Unnecessary to promote General Deterrence ................23

    D.    A Custodial Sentence is Unnecessary to Keep Foder from Reoffending .............24

CONCLUSION ....................................................................................................................25

## PRELIMINARY STATEMENT

As his guilty plea indicates, Michael Foder accepts unconditional responsibility for giving false testimony under oath regarding a photo identification he conducted in his capacity as a New York City Police Officer– the conduct giving rise to his offense of conviction, for which he now faces sentence. *See* 18 U.S.C. § 1623. By his own allocution, Foder fully recognized that he was not truthful about the date and the manner in which he conducted the subject photo identification. In short, Foder knew better and if he was able, he would unequivocally change his decision to continue obfuscating his prior misguided decisions. He let down himself and everyone else– the public, the Court, his loving family, and the Department he loved– by not giving full and complete thought to his actions.

Michael Foder did not set out to betray the public trust. The duty to serve and protect formed the very core of Mr. Foder's identity and unfortunately, this proved to be his downfall. He truly believed that he was doing the right thing in helping to arrest and charge the individual identified in the photo array, who he believed, and who we submit even the Government believes, to be guilty of the crimes charged in the underlying criminal proceeding. His decision to essentially back date the photo identification, and then fail to reveal those actions when questioned about it, was a grave lapse in integrity and character. Mr. Foder highly valued his time as a New York City Police Department (NYPD) Police Officer and Detective. It was an honor and a privilege that he valued, appreciated and took with the utmost seriousness each day that he was fortunate to represent the NYPD. Although Mr. Foder was only ten years into his career, in his short time with the Department he proved himself as a dedicated, professional, and hard-working officer. His tarnished legacy only compounds the deep regret Mr. Foder feels over his

1

actions, and the damage that it has caused to his family and fellow officers. Through this memorandum we hope to assist the Court with information and identify other factors that we submit are relevant and should be considered in imposing a non-jail sentence in this matter.

As the Court is well aware, the Guidelines are just one of the Section 3553 factors a Court need consider in imposing a sentence, and at best are a rough approximation of sentences that might achieve § 3553(a) objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007). Based on the Supreme Court's decisions in cases such as *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 552 U.S. 38 (2007), and their progeny courts must look not only to the Sentencing Guidelines, but also to the entirety of the Sentencing Reform Act in fashioning a sentence. The Guidelines are advisory and are to be given no greater weight than any other factor in the Sentencing Reform Act. Under *Gall*, moreover, courts need not find extraordinary circumstances to deviate from the guideline range. Further, non-guideline sentences are not presumptively unreasonable and the Supreme Court has sought to guard against what is described as "approaches...com[ing] too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at 47

The question now before the Court is whether a sentence of incarceration, as a strict Guideline approach presumes, or a lesser sentence of probation, as we propose, will be sufficient, but not greater than necessary to comply with the sentencing factors of 18 U.S.C. 3553.

For the reasons set out below, the defense urges the Court to impose a non-custodial sentence on Mr. Foder consisting of probation and community-based supervision as the Court deems necessary. In sum, as documented in the numerous letters of support accompanying this

2

memorandum, and based on the peculiar facts of this case, Michael Foder is a good man in every sense– a good father, a good son, a good brother, husband, co-worker, and friend. He is a man of decency, good character, and kindness for whom a  noncustodial sentence is "sufficient, but not greater than necessary" to satisfy the goals of punishment. *See* 18 U.S.C. § 3553(a).

## I. OFFENSE CONDUCT

Detective Foder pleaded guilty to one count of perjury in violation of 18 U.S.C. § 1623. Section 1623 makes it a crime for anyone who is under oath in a proceeding before a court or a grand jury to knowingly make a "false material declaration."

Specifically, Foder admitted that on December 29, 2016, he lied while testifying under oath in the United States District Court for the Eastern District of New York about the identification procedures he used in conducting a photo array, and the date on which it was conducted.

Although the testimony in question was on December 29, 2016, and although Foder was never charged with any crimes related to falsifying the photo array in issue, one has to go back to October and November 2015 for the proper context of the perjured testimony, for that is the genesis of Foder's misconduct.

On October 16, 2015, the complaining victim ("the victim") was the victim of a robbery and livery car jacking in the confines of the 70th Precinct in Brooklyn, New York. Three males entered the victim's car and subsequently one male, later identified as Sasha Honore, displayed a firearm, demanded the victim's money and property, and ultimately took his car, leaving him at the side of the road. The victim called 911 and officers from the NYPD 70th Precinct responded and brought him back to the station house.

On that evening, then Police Officer Michael Foder was working in the 70th Precinct and was assigned to investigate the aforementioned crime. Unfortunately, Officer Foder had just recently been assigned to the Detective Squad and by all objective accounts was inexperienced and not versed in NYPD Detective Bureau Protocol. (He was later promoted to Detective, but that would not be until late in 2017). After interviewing the complaining witness and getting descriptions of the alleged perpetrators, P.O. Foder utilized the Department's "Photo Manager" system and had the complaining witness look through the photos of individuals to see if he recognized any of the individuals provided by the computer program. The complaining witness recognized Sasha Honore and identified him as the individual who displayed the firearm. Thereafter, P.O. Foder conducted a photo array with the complainant (although not required) and the complaining witness again identified Honore. A warrant was then issued for Honore who was arrested on or about October 22, 2015 by a member of the NYPD Warrant Squad. Thereafter, a lineup was conducted and the complaining witness again identified Honore as the individual who displayed the firearm. He was then arrested and arraigned for the robbery. The two other perpetrators of the car jacking remained at large.

Subsequent to Honore being arrested, P.O. Foder received information that the two other individuals who may have been present during the robbery were Mardoche Petitphare and Rayvaughn Williams. This information included a positive fingerprint identification of Petitphare taken from the steering wheel of the complaining witness's vehicle. The evidence establishes that on November 27, 2015, into November 28, 2015 Foder conducted several computer inquiries, including obtaining the NYPD photo of suspect Mardoche Petitphare. On November 28th Foder, looking to confirm Petitphare's identity as the second perpetrator, and because the complaining

4

witness was not in the United States, sent Petitphare's photo via the cell phone application "What's App" to the complaining witness asking if he recognized him. The complaining witness identified Petitphare as one of the perpetrators, indicating he was the perpetrator who drove the car away from the scene. On that same date– November 28, 2015– P.O. Foder activated an "I-card" for Petitphare to be taken into custody. Because Petitphare was already in custody on other robberies he allegedly committed, he was also then subsequently charged with the October 16, 2015 car jacking. Upon information and belief Petitphare was arrested by federal agents on other crimes in which he was allegedly involved.[1]

Several days after this identification, Foder was asked by a supervisor whether he conducted a photo array identification procedure with the complaining witness regarding Petitphare. He said he did not, as he was unaware that he was required to do so. Foder was directed to do so. He therefore prepared and conducted a photo array on or about December 2, 2015. The complaining witness again identified Petitphare and indicated Petitphare was the one who drove the car away from the scene.

Foder wrote the incorrect date of November 27, 2015 on the photo array– an obvious mistake in hindsight– using the date on which the complaining witness first positively identified Petitphare via the misguided What's App text exchange. As Foder explained to Probation Officer Murphy when interviewed for the PSR, since he had the victim identify Petitphare several days prior to the photo array, he asked "what date should I use?" of his coworkers. All agreed to use the date he first identified Petitphare. It may seem obvious in hindsight that the unorthodox

---

[1] It should be noted that at this point Officer Foder had no knowledge that either the United States Attorney's Office or any federal agency was going to take over the prosecution of the perpetrators, which is what ultimately occurred.

manner in which the identification occurred is highly problematic, but as Foder explained, he was, "in over his head," "overwhelmed," and "inexperienced."The fact remains that Foder intentionally wrote the incorrect date on the array.[2]

It was not until several months later– after Foder had closed his cases– that P.O. Foder was notified that the United States Attorney's Office for the Eastern District of New York had taken over the prosecution of Sasha Honore, Mardoche Petitiphare, and Rayvaughn Williams. In December 2016, over one year after the subject photo array, pre-trial hearings began in those matters. As is pertinent to the present case, P.O. Foder testified on December 29, 2016, before the Honorable Edward R. Korman. It is here where Foder's ultimate lack of judgment occurred. Foder had the opportunity at this point to fix his prior errors. He did not, but instead dug the hole deeper by not bringing this to the attention of from the U.S. Attorney, and ultimately, testifying falsely.

We direct the court to that portion of Foder's testimony at the pre-trial hearing which forms the basis of the perjury here in this case:

Q:     I am directing your attention specifically to November 27th of 2015. Did you conduct any photo arrays on that date?

A:     Yes.

Q:     I'm placing before you a document I've marked, this will be page 3 of Government's Exhibit 6. Detective, do you recognize this document?

A:     Yes.

---

[2]Although not part of the count to which Foder pleaded guilty, several months later, the third perpetrator– Rayvaughn Williams– was arrested by members of law enforcement evidently on charges unrelated to the car jacking. Upon being notified of this arrest, P.O. Foder subsequently prepared arrest paperwork on Williams on or about February 14, 2016, charging him with being the third individual present in the car during the car jacking. Essentially Foder admits repeating similar transgressions and taking several shortcuts in regards to the Williams photo array. Foder admits falsifying and backdating the Williams photo array as well. Foder, then failed to reveal those actions to both the AUSA and the Court when testifying on December 26, 2016.

Q:      What is it?

A:      It's my photo array that I conducted.

Q:      On November 27th, 2016 [sic]?

A:      Yes, sir.

                              *    *    *

Q:      And today you told us about a photo array that took place on November 27th, is that correct?

A:      Correct.

                              *    *    *

Q:      You said that you showed that photo array on November 27th, is that correct?

A:      Correct.

Q:      And that the complaints [sic] looked at the photograph for about two minutes?

A:      Two minutes, yes, sir.

Q:      Did you note that anywhere?

A:      No, sir.

Q:      And this is again your recollection?

A:      Yes.

Q:      Did the complainant indicate a level of confidence with respect to the identification of the person he identified on November 27th?

A:      Yes.

Q:      What level of confidence did he indicate?

A:      He was very sure about which guy got out of the back seat of the car and got into the front seat.[3]

---

[3] Indictment, p. 2-4, *U.S. v. Foder*, No. 18-97 (E.D.N.Y.)

7

While Foder knew that agreeing with counsel that Nov. 27th was the date of the photo array was wrong, he "panicked." We submit that it becomes clear that Det. Foder did not go out of his way during his testimony to create an elaborate lie or false description of events. A review of his testimony shows that his testimony was very limited to yes and no answers. In no way are we minimizing the perjury at issue here, but we submit that there is a vast difference between an officer who takes the stand and perpetrates a fraud and intentionally and elaborately creates a false narrative and fabricates evidence, versus someone who has painted themself into a corner and panics and who was afraid to admit to his past conduct and, frankly, incompetence. The vast majority of the cited testimony was, of course, entirely truthful. As he acknowledged, moreover, there are details he just does not recall. As he explained, had he thought even for a moment that these were not the individuals who committed the robbery, he would never have taken the actions that he did. It was never his intention to lie to the Court, and he is deeply remorseful that ultimately his actions in burying his head in the sand led to the dismissal of some of the charges against these defendants. He recognizes that he should have informed the AUSA of the problem and fixed it before it got this far. He did not and will have to live with the pain of the mistake for the rest of his life.

On or about August 1, 2018, Det. Foder resigned from the NYPD. He has forfeited everything– his pension, as well as any and all benefits he otherwise would have been entitled to. He has since found new employment and continues to provide both financial and emotional support to his family.

## II. GUIDELINES ANALYSIS

The Government and defendant have stipulated to an adjusted offense level of fourteen

(14), calculated as follows:

|  | Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.3(a)) | 14 |
| Substantial Interference with Administration of Justice (§ 2J1.2(b)(2)) | +3 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a) | -2 |
| Pleads Guilty On or Before 8/3/2018 (U.S.S.G. § 3E1.1(b) | -1 |
| **Total Offense Level** | **14** |

In Criminal History Category 1– this is Foder's first offense– level fourteen carries a sentencing range of 15-21 months imprisonment. We respectfully submit, however, that a sentence outside the guidelines range is warranted and appropiate under the circumstances of this matter. Specifically, a non-custodial sentence consisting of probation would address all of these factors set forth under 18 U.S.C. §3553(a).

## THE COURT SHOULD REJECT PROBATIONS' CALCULATION OF A 2-POINT ENHANCEMENT FOR "ABUSE OF A POSITION OF PUBLIC TRUST"

We object to the upward adjustment in the base offense level proposed by Probation for allegedly "abus[ing] a position of public or private trust, or us[ing] a special skill, in a manner that significantly facilitated the commission or concealment of the offense," as per U.S.S.G. § 3B1.3. Both the Government and the defendant agree that the upward adjustment is not warranted based both on the law and the facts of this case.

Citing *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008), the United States Sentencing Guidelines (U.S.S.G.) "specify that '[t]his adjustment [abuse of a position of public or private trust] may not be employed if an abuse of trust...is included in the base offense level or specific offense characteristic.'" (citing U.S.S.G. §3B1.3). We submit that it is inherent to his

9

offense of perjury in this particular case that Foder was violating a position of trust.

Further, Mr. Foder does not warrant an enhancement for violating a position of public or private trust because the perjury at issue here does his fit within the guidelines. The "abuse-of-trust" adjustment "applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim. '" *United States v. Garrison*, 133 F. 3d 831, 839 (11th Cir. 1998) (*quoting United States v. Jolly,* 102 F.3d 46, 48 (2d Cir. 1996)); *see also United States v. Walker,* 490 F.3d 1282, 1300 (11th Cir. 2007); *United States v. Williams*, 527 F.3D 1235, 1250 (11th Cir. 2008). When employing this enhancement, a sentencing court must not be "overly broad" because otherwise "the sentence of virtually every defendant who occupied a position of trust with anyone, victim or otherwise would receive a section 3B.1 enhancement." *Williams*, 527 F.3d at 1250 (quoting *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir. 1995)). As such, courts have held that there "must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty." *Williams*, F.3d at 1250-51. In *Williams*, for example, the 11th Circuit rejected an adjustment under §3B1.3 explaining that such an adjustment is not warranted where the government or an agency thereof, while technically "a victim" of the fraud at issue, "an abuse-of-trust adjustment was unjustified because the defendant "did not occupy a sufficiently proximate position of trust relative to [Medicare]." Id. at 1250 (internal citations omitted).

Under these circumstances, we submit Foder does not fit the definition of violating a position of public trust at the time of the offense as contemplated by the guidelines. Nonetheless, even assuming *arguendo* that Foder was in a position of public trust, there must also be a showing that he abused his position "in a manner that significantly facilitated the commission or

10

concealment of the offense." U.S.S.G. §3B1.3. This is simply not the case here. As is noted in the sentencing guidelines itself, "the position of trust must have contributed in some substantial way to facilitating the crime and **not merely have provided an opportunity that could as easily have been afforded to other persons**." U.S.S.G. §3B1.3 (emphasis added). Notably, the Government is in agreement with defendant's position on this issue. In their letter dated January 4, 2019 in response to the PSR they stated:

> Mr. Foder's perjury was discovered in no small part because the audit trail on the NYPD's photo manager system had not been altered and this revealed that Foder's testimony about the timing of certain photo array procedures was false...the particularized requirement that Foder's position in law enforcement significantly facilitated his perjury does not exist and the enhancement is not applicable."

His alleged position of trust is not what facilitated the crime, and he took no steps to cover up his transgressions.

It is also worth noting that Mr. Foder is already receiving a sentencing enhancement under the proposed guidelines calculation for "Substantial Interference with the Administration of Justice." Given this, the additional sentencing enhancement for violating a position of public trust is duplicative and unwarranted. When coming to a plea agreement, enhancements and decreases in the sentencing level were taken into consideration. The government did not move for an enhancement for violating a position of public trust, and in fact, disagree with its addition. This potential enhancement was not taken into consideration at all during plea negotiations, where a total offense level of 14 was agreed upon. Given Mr. Foder's acceptance of responsibility, timely manner of entering a plea, and already enhanced sentence for obstruction of justice, the additional sentencing enhancement is completely unwarranted.

11

## III. PERSONAL HISTORY AND CHARACTERISTICS

### A.    Foder Admirably Served the People of New York City as a 10-Year Law Enforcement Officer.

Becoming a police officer was one of the proudest moments of Foder's life. *See* Letter of Andrea Foder ("A. Foder Ltr."), attached hereto as Exhibit A. Foder comes from a family of law enforcement officers; his two brothers are also employed by the NYPD, one as a Lieutenant, and the other as a Patrolman. He truly loved his job. *See* Letter of James Hansen ("Hansen Ltr."), attached hereto as Exhibit B. Foder devoted his entire life to serving the citizens of New York City and keeping our streets safe. *See* Letter of Carmine Confessore ("Confessore Ltr."), attached hereto as Exhibit C; A. Foder Ltr.(Ex. A).

Foder worked hard and his career flourished. *See* Letter of Dennis R. Ferber ("Ferber Ltr."), attached hereto as Exhibit D. He was a standout worker and as such, he was rewarded with being moved into specialized units and then subsequently promoted to the rank of Detective. *See* Confessore Ltr. (Ex. C). Lt. Dennis Ferber summed up his career well:

> He started as a rookie officer in my Field Training Unit, where he was very active, making many arrests and responding to the community's needs. Michael then went on to patrol duties, but wasn't there long due to his hard work. He was quickly picked up to work in the Precinct Conditions Unit where he addressed low-level community problems. He flourished in this unit and was promoted to the Street Narcotics Unit. In this unit, Michael made many prominent arrests by developing confidential informants, studying precinct conditions and perpetrators, and interacting with the community who regularly provided him with information because of the trust he developed with them. After [Lt. Ferber] retired, Michael was assigned to the Precinct Detective Squad, where he was a valuable assets because of the knowledge and skills he attainted in the years working his way up the precinct level.

Ferber Ltr. (Ex. D).

Foder served with "integrity and the utmost character" and this dire mistake is very much not in character for him. *See* Letter of Emmanuel A. Vizotti ("Vizotti Ltr.") attached hereto as

12

Exhibit E; Ferber Ltr. (Ex. D). As Lt. Ferber explained, "his actions were not that of a corrupt cop with a pattern of illegal behavior, but an act of laziness, making administrative mistakes and failing to take appropriate steps to correct that mistake." Ferber Ltr. (Ex. D). "I believe he was trying to keep the community safe from three extremely bad people but he made mistakes in the process. He tried to correct them with more mistakes & bad decisions until it all got away from him and was beyond repair." Letter of John Foder Jr ("J. Foder") attached hereto as Exhibit F. *See also*, Letter of Timothy J. Foder ("T. Foder") attached hereto as Exhibit G. Of course there is no excuse for laziness and he should have followed correct procedure and owned up to his mistakes, but we cannot downplay the difference that Mr. Foder made because of his career and the lives that he saved. *See* Vizotti Ltr. (Ex. E). "People are alive today that would not be but not for the work of Michael Foder." Vizzotti Ltr. (Ex. F). Besides the act for which Foder has pled guilty, his career was unblemished. *See* Letter of Michael Foder ("M. Foder Ltr.") attached hereto as Exhibit H.

Michael Foder not only made a difference in the lives of the citizens of New York, but in the lives of his fellow officers. When rookie officers started the job Det. Foder made sure that they knew that he was there for them. *See* Letter of Vasilios C. Vasilopoulos ("Vasilopoulos Ltr") attached hereto as Exhibit I. The way that other officers speak about Mr. Foder speaks volumes about the type of person that he was– "I remember him constantly reminding us that his phone is always on, and for us to never hesitate in calling him if we needed any help, whether it was job related or personal issues. Most of the officers offered this, Mike was the only one who followed through with it and meant every word he said." Vasilopoulos Ltr. (Ex. I). Additionally, being that Det. Foder joined the Department a few years later in life than most do, he was older

than most in his rookie class and looked up to as an "older brother." Hansen Ltr. (Ex. B); Confessore Ltr. (Ex. C). Officer Vizotti described Det. Foder as being the "voice of reason" and stated that he was "incredibly lucky to have befriended Michael." Vizotti Ltr. (Ex. E).

**B.      Foder is a Devoted Father, Husband, and Friend**

The level of devotion and love that Det. Foder shows to his family and friends is a common theme across every letter written about him. Foder would tell his friends in the Department, "family is everything and should always come first in your life." Vasilopoulos Ltr. (Ex I). His deep belief in this sentiment is apparent and something one can gauge within minutes of meeting him. *See* A. Foder Ltr. (Ex. A). "No matter what ups & downs Michael has gone through in life, the one constant is he has always been a devoted father to his three children, Michael (MJ), Justin & Samantha." J. Foder Ltr. (Ex. F).

Even during these tough times due to this case, Det. Foder has made sure to be "the best dad and partner he could be." A. Foder Ltr. (Ex. A). This is because Det. Foder is always genuinely and undeniably himself and his kindness shows through everything he does. As his oldest son, Michael Jr. wrote, "Although it's been an extremely tough situation for him, he's made sure to see me and help me through others things ocuring in my life right now." *See* Letter of Michael Foder Jr. ("M. Foder Jr. Ltr.") annexed hereto as Exhibit J. Even when he and his wife were going through a divorce (though they have since gotten back together), she still had nothing but good things to say and saw the great person that Det. Foder is. "Even though we divorced, we remained close. We had a great relationship because we were always friends above all else." A. Foder Ltr. (Ex. A). Andrea's sister also describes him as a "good hearted and dependable" person. Letter of Elissa LeBow ("LeBow Ltr.") annexed hereto as Exhibit K. She writes:

14

> Michael and my sister Andrea started dating at a very pivotal time in our lives. It was only a few years after the passing of both of our parents to illness. Michael proved to be an immense and tremendous support for my sister and our family on the whole. He protected and took care of her the way and father or mother would want their daughter to be treated.

LeBow Ltr. (Ex. K).

Everyone agrees: "[h]is children are his world, and he is theirs." Vizzotti Ltr. (Ex. F). As Mr. Vasilopoulos noted, "The relationship that I see between him and his children is something that I wish one day to have with my own children." Vasilopoulos Ltr. (Ex. I). One must be a special type of person to have this type of relationship, and it does not go unnoted by everyone who he spends time with. Det. Foder is the "rock" of his family. *See* Letter of Desmond McNamee ("McNamee Ltr.") attached hereto as Exhibit L. Foder's son, MJ notes, "He's taught me the importance of family, and loving one another to the fullest despite the differences we may have." M. Foder Jr. Ltr. (Ex. J).

Despite being very busy, Det. Foder made time to coach two of his children's basketball teams at St. Clare's. He loves coaching them and they love having him by their side to share in this experience. A. Foder Ltr. (Ex. A). Det. Foder is such an integral part of his family's life that they "would be crushed without him home and in [their] everyday lives." A. Foder Ltr. (Ex. A); *see also* Letter of Christopher W. Donohue ("Donohue Ltr.") attached hereto as Exhibit M. "[Det. Foder's] love for [his children] is apparent in everything that he does. To lose him would be devastating to them." Vizotti Ltr. (Ex. E).

His family speaks very highly of him. His sister-in-law, Elissa LeBow notes in a very telling story that:

> Michael is a family man, dedicated partner, loving father, crazy fun uncle, loyal friend, beloved son, grandson, brother, basketball coach, mentor...and the list goes on. He is known by all and loved by most. I have personally seen how amazing and reliable he could be. I want to speak of one story in particular. I had just returned to work after having my first child. As a Physician Assistant there are very few instances in which one

could say that they were not able to report to work. My son woke up with a fever of 103 degrees, I would not be able to bring him to daycare, and my husband had not yet returned home from work. Michael was the first person I called. He came right over straight from work, it was 5:30 am, he took the baby, and sat with him until my husband returned home. He could have said no, he didn't have to answer the phone, but he did.

LeBow Ltr. (Ex. K).

Foder's son describes him as his biggest role model:

My father has been the greatest role model in my life, and I've looked up to him since day one. He's taught me how to be a leader and role model for others in my life, such as my younger siblings, Samantha and Justin, who also look up my father as an extraordinary father, and make sure to tell everyone how much they love and adore him as much as they can. He's taught me to always believe in myself and to note listen to the negative words that others say because only you can define you. That's the motto I live by every day of my life, and what has helped me achieve many things thus far. Without my father I wouldn't be half the man I am today and there's no doubt in my mind about that. The list of good things I can say about my father could go on and on.

M. Foder Jr. Ltr. (Ex. J).

Foder's selfless nature means that he puts everyone else before himself and this goes for not just his family, but his friends as well. Vizotti Ltr.. (Ex. E). There are many anecdotes throughout these letters that illustrate the many amazing sacrifices that Det. Foder has made for his friends. Even if it is an inconvenience for him, Det. Foder will do anything to make someone else feel better. Police Officer Carmine Confessore writes:

In our second year of Impact, I received a notification that I was being permanently tour changed to 6pm-235am with a few other people, but Mike wasn't one of them. I was pretty upset about it because I liked working during the day and I wasn't going to be working with my closest friend from work anymore. Mike saw that I was bummed out and he volunteered to be tour changed as well. He would always say, "It won't be bad bud, we'll make the best of it." And we did.

Confessore Ltr. (Ex. C).

Even before they were friends, P.O. Confessore saw what an amazing person Det. Foder is:

16

> During precinct orientation, Mike saw that I was a bit introverted, sitting by myself, and came over to talk to me. He immediately made me loosen up with his funny but friendly personality, from there on, at least I knew I had one potential friend. Little did I know he would become one of my closest friends for the next decade.

Police Officer Vasilios Vasilopoulos has a similar story about Det. Foder. He writes:

> When I arrived [at the 70th Pct.] I did not know what to expect. Just like every other rookie officer I was nervous, shy and I did not know what was to come and then I met Mr. Foder....Throughout my career Mr. Foder was always there for me as a friend as well as a mentor. I remember him on his way out [of] the precinct seeing me and staying with me to make sure that I was okay.

Vasilopoulos Ltr. (Ex. I).

Maynard Edrington shared a similar sentiment:

> What I can speak to is the man that I know personally as a great friend and better person. He has always taken care of his responsibilities and is a role model father and family man. Never have I questioned his loyalty to me or the job, as a young officer he always looked out making sure whatever I needed I had an any questions were answered. He never gave me wrong advice or put me in a compromising position. Michael Foder though not perfect long as I've known him has been a man of the best character.

Letter of Maynard Edrington ("Edrington Ltr.") attached hereto as Exhibit N.

Det. Foder does not hesitate to step in when someone needs something. Lisa LaBarbara noted, "when I was not able to drive my son to games due to illness, Mr. Fod[e]r did not hesitate to step in and pick up my son, take him to the games and bring him back home again." Letter of Lisa LaBarbera ("LaBarbera Ltr.") attached hereto as Exhibit O. His selfless nature inspires others and this is something that cannot be discounted. "For me, Michael Foder is a good man. He is honest to me as a friend and Coach to my Son. His love for his family and community encourages me to do the same." Letter of Michael S. Licitra ("Licitra Ltr.") attached hereto as Exhibit P. "He is a person who I have deeply depended on through our friendship as a man of strong merit and will....He is someone that always puts others before him and will continue to do so long after this process." Donohue Ltr. (Ex. M).

17

## C.    Foder is a Mentor to the Community

It is one thing for someone's family to note what a great person someone is, and another entirely for neighbors and members of his community to take the time to write letters. This in itself shows exactly what type of person Det. Foder is and the impact that he has had on his community. Det. Foder is described as a "good neighbor" and "upstanding member of the community" even in the face of all of his hardships. Letter of Sonia Justiniano ("Justiniano Ltr.") attached hereto as Exhibit Q. In fact, as one neighbor wrote, "Jail time would be a punishment not only to Michael but to his children, the children of this community and the families in our community who rely on Michael in so many ways." Letter of Jill Vero-Kipp ("Vero-Kipp Ltr.") attached hereto as Exhibit R.

As mentioned earlier, Det. Foder is the coach to two of his young children's basketball teams– Justin and Samantha. Coaching two teams of course takes up a significant amount of time. Even so, Det. Foder does not just put in the minimum level of effort, he gives it his all. As such, countless children, as well as their parents, view Det. Foder as a mentor and an invaluable asset to their community. For example, one parent of a child on Det. Foder's team writes:

> I first met Michael Foder when he began coaching my son's basketball team at St. Clare School on Staten Island. This was a very delicate time for my son, Jason, and my family, as my husband, Jason's father, had suddenly passed. During this time as a coach, I witness him working with the children on the team, the staff members at the schools, and with the coaches of the other teams. In particular, I witnessed how he became a positive role-model for my son, and I will be forever thankful to him for being such a great influence on Jason. Michael has always showed the utmost respect and care during his work as a coach. His first and foremost concern during the time I was in his company was for the well fare and positive experience of the boys on the basketball team. He has made a lasting positive impression on my son and continually encouraged him as a player, student, and team member.

Letter of Gina Caliendo-Ocasio ("Caliendo-Ocasio Ltr.") attached hereto as Exhibit S.

Another parent shares a similar story about what a positive impact Det. Foder left on her

18

son– "I will always be grateful to Mr. Fod[e]r for the way he handled the situation when my son was being bullied at school regarding how he played basketball." LaBarbera Ltr. (Ex. O). Michael Licitra, who served as an assistant coach for the team, expanded on this story:

> I always remember Michael calling a team meeting a few years ago when he became aware that one of our new inexperienced players, Jeremiah, was being bullied in school from a student that played on a more skilled team that he shouldn't be playing basketball because he will never be good. Coach Foder explained to all our kids that they all deserved to be there playing and were valuable members of the team. He also offered the best words of motivation and encouragement to Jeremiah that years later he is still playing and shows up to practice and games with much confidence and pride. Michael Foder reaches all the kids in this manner.

Licitra Ltr. (Ex. P).

These are not actions that Det. Foder has or had to take, but ones that he did and still does because of the kind-hearted, caring, and selfless man that he is. As Jill Vero-Kipp wrote:

> For the past four years, Michael has been a driving force in my son's life. My son Shane is nine years old and views Michael as a father figure. My son has learned to trust himself and others through Michael's ability to build a team spirit amongst the children and the parents of this neighborhood....He has demonstrated unconditional dedicated to the families of our neighborhood. As a New York City Department of Education Teacher, I can confidently say that he has had a positive impact on the youth of Staten Island. Countless parents rely on Michael's ability to build their children's confidence. As I hear of the possibility of losing Michael for an extended period of time, I worry about the well being of his family, and our neighborhood.

Vero-Kipp Ltr. (Ex. R).

There are many similar stories and sentiments shared in the attached letters. We respectfully refer the Court to Exhibits "T" and "U" in particular. *See* Letter of Jeanine Villamagna ("Villamagna Ltr.") attached hereto as Exhibit T; Letter of April Berardinelli ("Berardinelli Ltr.") attached hereto as Exhibit U.

These are invaluable lessons that Det. Foder has instilled in countless children. He is a mentor to all of the kids that he coaches. *See* Letter of Gerard Novello ("Novello Ltr.") annexed

19

hereto as Exhibit V. As Ms. Vero-Kipp aptly stated, "Michael is the heart of our community and his absence will be felt by its children." Vero-Kipp Ltr. (Ex. R).

### IV. <u>A NONCUSTODIAL SENTENCE IS APPROPRIATE HERE</u>

A noncustodial disposition is "sufficient, but not greater than necessary," to accomplish the goals of sentencing– retribution, deterrence, and incapacitation– in Foder's case. *Kimbrough v. United States*, 554 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).

### A. A Noncustodial Sentence Will Adequately Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

Without minimizing his conduct, Foder is a far cry from the stereotypical "dirty cop" who doubles as a criminal or abuses his authority by corrupting justice. Ferber Ltr. (Ex. D). Det. Foder took his job very seriously and as such, worked extremely hard to do the best work that he could. His friends and family spoke of how out of character this incident was[4], one describing it as "aberrant." Justiniano Ltr. (Ex. Q). In the end, his actions were a grave mistake, but this point cannot be overstated: this was a "a terrible mistake. A mistake that Michael will live with for the rest of his life. A temporary, isolated moment of bad judgment in an otherwise life of good." Vizzotti Ltr. (Ex. F).

To be clear, Foder recognizes that he chose to take the shortcuts that he did. To make matters worse he "buried his head in the sand" and did not make it right when it counted– prior to his testimony before Judge Korman.

The Foder family has been devastated by his actions. Foder has lost his beloved job and means of providing for his family, his hard-earned pension, and his reputation. *See* J. Foder

---

[4] "I cannot state strongly enough how out of character this was for Michael." Ferber Ltr. (Ex. D); "Mike would never do anything malicious to anyone nor violate a very important law on purpose." Confessore Ltr. (Ex. C); "I only knew him to serve with integrity and the utmost character." Vizzotti Ltr. (Ex. F).

Ltr. (Ex. F); McNamee Ltr. (Ex. L); Donohue Ltr. (Ex. M); Vero-Kipp Ltr. (Ex. R). This has put a "huge strain" on his family. J. Foder Ltr. (Ex. F). The months since Foder was charged have already been difficult "emotionally and financially" on the family. A. Foder Ltr. (Ex. A). To sentence him to a term of incarceration is not necessary here. Det. Foder loves nothing more than his family. "I ask with great humility that you grant me leniency so that I may continue to be present in the lives of my wonderful wife and children." M. Foder Ltr. (Ex. H)

To lose his job after he "devoted his entire life"[5] to it and let down the people that he cares about most was devastation enough. The day that he resigned from the NYPD "was one of the hardest days of his life." A. Foder Ltr. (Ex. A). It is clear in his actions that he has been greatly affected by this incident. Lt. Ferber noted, "the mental stress has taken a toll on him and his family." Ferber Ltr. (Ex. D). Additionally, "Michael is full of remorse; he is saddened by his actions, and is devastated with what the future may hold for his family." LeBow Ltr. (Ex. K); *see also* M. Foder Jr. Ltr. (Ex. J).

Michael is the father to three children– Michael Jr. or "MJ" (19), Justin (10), and Samantha (8). It is important to note that "imprisoning him [would] not only punish him but would be a crushing blow to his young impressionable children." Donohue Ltr. (Ex. M). He would miss so many moments in his children's lives. Michael Jr. notes:

> Taking him away from my life will be something that I'm not sure how I'd handle...Even not being able to see him very often, our texting and calling everyday, and making sure he's been in my life all these years has not changed my mind about him being my biggest role model. He's someone I'm going to look up to for the rest of my life, no matter what. In addition, ripping my father directly out of the lives of my brother and sister who love and care about him so much is heartbreaking for me to even just think about. They need him in their lives more than anything else, and without him, I can't even imagine the toll it will take on them mentally and emotionally.

---

[5] A. Foder Ltr. (Ex. A).

M. Foder Jr. Ltr. (Ex. J).

Michael is a dad "who takes care to do the little things from [his children] such as helping with homework, driving them to school and practices, and coaching them in sports." Ferber Ltr. (Ex. D). Even though his older son, MJ, is no longer a "child", he is at a point in life where he "is just becoming a man and he will need his dad now more than ever." McNamee Ltr. (Ex. L).

In short, a prison term is not necessary to provide just punishment in this case. "[T]he suffering [Foder] and his family have endured will always be a burden to them [and is] punishment enough...for someone who always wanted to do good." Ferber Ltr. (Ex. D).

**B.    The Public Scrutiny Surrounding Foder's Case and His Status as a Former Cop Weigh Heavily Against Imprisonment**

Foder's high-profile fall from grace at the NYPD, particularly in today's climate, argues strongly against incarceration. In prison, Foder's status as a former police detective, combined with extensive publicity attending his case[6], would either expose him to abuse from fellow inmates or require preventive segregation, forcing him to serve his sentence under unusually harsh conditions. *See United States v. Koon*, 518 U.S. 81 113 (1996) ("the extraordinary notoriety and...media coverage of this case, couple with the defendants' status as police officers," make them "unusually susceptible to prison abuse") (internal citation and quotations omitted); *see also United States v. Volpe*, 78 F. Supp. 2d 76, 88-89 (E.D.N.Y. 1999).

"Extreme vulnerability" to in-prison victimization is a factor the Court should consider in fashioning an appropriate sentence. *United States v. Lara*, 905 F.2d 599, 602-03, 605 (2d Cir. 1990) (Vulnerability to prison abuse properly considered in reducing sentence); *cf. Koon, 518* U.S. at 112 (susceptibility to prison abuse is "just the sort of determination that must be accorded

---

[6] Should one Google his name, the entire first page of results are news articles about his charges and subsequent plea and conviction. "He and his family have suffered great public scrutiny that has made it difficult for them to interact in any manner with his community." Ferber Ltr. (Ex. D).

deference" on review).

While in today's climate where every police misstep is highly publicized, one might think that they must make an example out of Det. Foder. Since Foder "is to be punished for his crimes," not the "media coverage" accompanying them (*Volpe*, 78 F. Supp. 2d at 89), the interests of justice weigh against a custodial sentence.

**C.     A Custodial Sentence is Unnecessary to Promote General Deterrence**

Section 3553(a)(2)(B) and (C) direct the Court to consider the need for a sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. Deterrence and protection, two bedrock goals of sentencing are more than adequately vindicated by a sentence here of probation. Foder's former colleagues know very well of the toll that this case has taken Foder and his family.[7] As the annexed letters confirm , no officer aware of what Foder has been through can reasonably think he escaped with a mere wrist slap. With prison, or without, Foder's story is nothing if not a cautionary tale– one that will undoubtedly encourage officers to be hyper vigilant with their work and avoid taking similar short cuts.

As such, the principles of general deterrence are served. Foder's arrest and conviction has and will undoubtedly send a strong message that perjury of any kind will be treated harshly, and will not be tolerated. Section 3553's mandate for a sentence to account for the need to protect the public from further crimes of the defendant is satisfied by a non-guidelines sentence for the same reasons as described above as Foder will be very unlikely to recidivate. As Lt. Ferber noted: "His

---

[7] "Mike worked so hard to become promoted to Detective and I was there the day he was promoted. I can't imagine what this has done to him, with not being able to perform the job he loves." Hansen Ltr. (Ex. B); "He lost his ability to be a Detective and must now living with the consequences that come with that. He has suffered, and his family has suffered." Vizzotti Ltr. (Ex. F); "He has truly suffered as this is a mistake that will follow him for the rest of his life and will have lasting effects." Donohue Ltr. (Ex. M); "I am fully aware that he made a huge mistake and I know he is suffering from it." Vasilopoulos Ltr. (Ex. I).

incarceration will not make the community any safer, it will not undo what he has done, and what he has already suffered...is enough to keep others from making the same mistake." Ferber Ltr. (Ex. D).

###    D.    A Custodial Sentence is Unnecessary to Keep Foder from Reoffending

There is also no need to protect the public from future crimes by incarcerating Foder. He presents zero risk of recidivating. Det. Foder spent his life fighting crime– not committing it. This crime occurred because of a mistake, and it is one that cannot happen again, both because he is no longer a member of the police department, as well as the fact that he has more than learned from his mistake. He deeply regrets his mistake and everything in his background cuts against repetition.

A sentence of probation will undoubtedly deter Mr. Foder from committing further crimes. There is little question that this, his first conviction, will teach a harsh lesson to avoid future criminal conduct. Mr. Foder is an intelligent, hard-working, and selfless individual. There can be no doubt that he will live and raise his children in the most positive and productive manner possible. "Michael is a 100% devoted family man and community leader who teaches the kids...hard work, dedication, the importance of education and most importantly RESPECT for one another." Licitra Ltr. (Ex. P). Additionally, he has secured gainful employment to provide the financial support his family needs.

Michael Foder presents zero risk of reoffending, making a sentence of incarceration unnecessary, superfluous, and not in the interests of justice.

## CONCLUSION

Foder's family and friends know that he has learned from this experience and will never falter again. They proudly support him, appealing for leniency in deference to Foder's long commitment to serving the community. As his supervisor of eight years wrote:

I ask that you realize that Michael has made his community much safer and often willingly put himself in harms way to do so. I ask that you realize that he has done good for his city, and while it does not excuse his action I believe it should have meaning in this matter. Finally, I ask that you sentence Michael to no jail time.

Ferber Ltr. (Ex. D).

Foder's loving wife, Andrea, further states:

For what it's worth, I have watched Mike over the past several months in his good days and his bad, he has truly shown remorse for making a bad decision to put him in this unimaginable place....I beg of you to be lenient with your sentence and to avoid jail time, I need him here to be a husband, and his children need him to be a father. Our family will not be the same without him. I am not familiar with the side of the man that stood before the Court. What I am familiar with is all of the sacrifices he has made and all of the good he has done as a police officer and detective. I understand that justice must be served and punishment must be dispensed. I ask that the Court temper its decision, and that it be predicated not only on what Michael has been accused of, but also what he has done in the past to better his community, and the positive aspects of what he will do in the future.

A. Foder Ltr. (Ex. A).

A noncustodial sentence will enable Foder to do just that– continue to be a positive influence in his family and his community's lives. It is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), and it is the punishment that fits both the offender and his offense of conviction. It is the sentence that is appropriate, and one we respectfully request the Court to impose.

Accordingly, we respectfully request that the Court impose a non-jail sentence with a significant community service component and any of the community-based supervision methods the Court finds most appropriate. This will allow for appropriate punishment while allowing Mr. Foder to remain close to the support network of family and friends, as well as the community who looks up to him.

Dated: February 15, 2019
New York, New York

Respectfully submitted,

JAMES M. MOSCHELLA
Attorneys for Defendant Michael Foder
KARASK & MOSCHELLA, LLP
233 Broadway, Suite 2340
New York, NY 10279